Good morning, Your Honors. Thank you for granting priority to us at a special request. I represent Rick Goerner against Axis Reinsurance Company in a duty to defend case. I feel good about the case because I think we went on the facts, the law, and we have drawn a great panel. And when I say a great panel, I just don't mean that I've met a couple of you at the Ninth Circuit Judicial Conference. I mean that each of you has participated in decisions that recognize duty to defend principles that are basic to California law. Judge Nelson, you authored the case that we cited in our brief, the Anthem case. I think it's called Anthem. That was a very wise thing to do. I'm glad I did. I just should have said the Distinguished Circuit Judge Nelson. But I did mention your name because I thought that was adding to the authority of the case. And Judge Ikuda, you wrote an unpublished decision, S.J. Amoroso, that also applied relevant California duty to defend principles in a capacity case where you said the capacity someone's operating in, if it's an officer, if it's just not totally ridiculous that he's acting as an officer, that's what California looks at. Excuse me. Let me ask you about what I'm troubled by. Not me. I was getting to you, but I've been interrupted, Your Honor. You're next. Flattery will get you everywhere. Hyundai. The Hyundai decision is a recent 2010 decision of the Ninth Circuit that applies the correct duty to defend principles. But Judge Ikuda, you had a question. Yes, let me tell you what I'm troubled by, and that's the case, our decision in Bowie Homes, which seems to say that where you can interpret individuals as having their director hats on for one company that's insured and having different director hats on for another company that's not insured, then the insurance only covers them when they're wearing their hats for the insured company. So why shouldn't we read the Second Amended Complaint as suing Gruner only when he has his MMT and, I guess, UNAV hat on and not when he has his TDI hat? Why doesn't Bowie just control that analysis? Well, first of all, I don't think Bowie controls a diversity case. We're supposed to apply, or the Ninth Circuit's supposed to apply the law of California as the Supreme Court would decide it. Bowie was decided before the Montrose decision and before many of the out-of-state cases that we cite. Not only that, but Bowie did not deal with an amended complaint. There was only one opportunity there, and Bowie significantly said right in the decision that the actions of these two corporations that these directors were taking were completely separate. There's no relation between the two corporations. Well, it's indicated in a footnote that it might be that the officers, if the officers were, in fact, working for the other company or working in their capacity, the court might have reached a different result, but interpreted the complaint as only suing the officers in their capacity as directors of the other company, so only with the acts they took with their second company hat on. And that's the argument that they're making here. And if we interpret the second amended complaint as suing Mr. Gerner only when he's acting for MMT and UNAV, not as TDI, then why is there even a potential for coverage? Well, the reason there's a potential for coverage is that California law is directed by Gray and Montrose, and by all the other California cases, says that you look at the policy language first. The policy language in Bowie was different from the policy language here. The policy language in Bowie said that someone's not even uninsured if they're not being sued in their capacity as an officer. Our policy does not say that. Our policy says Rick Gerner isn't insured if he is a duly elected officer. Right, but the wrongful act language says uninsured individual in their capacity as such. Yes, exactly. And what the policy also says is they will defend, the insurance company will defend any lawsuit alleging a wrongful act, an actual or alleged wrongful act. It doesn't say they would like you to believe that the policy says we will defend any suit suing Rick Gerner in his capacity as an officer. It doesn't say that. It says we will defend Rick Gerner in any suit alleging a wrongful act, that is, any error or omission that's actual or alleged taken in his capacity. As the director of TDI. As the director. So why don't we read the second, for Bowie, why don't we read the Second Amendment complaint as only suing him for acts taken in his capacity as an agent for MMT? Because he took those acts in fact, in actuality, as an officer of TDI. As shown in the complaint, because the complaint alleges that some of those acts were taken with the consent, knowledge, and paid for by TDI, which is certainly an implied statement that they're taken for TDI. In fact, and the extrinsic evidence shows that he was messing around with this technology for the purpose of protecting TDI, kind of parking the shots technology in friendly hands so that if TDI thought it was developed enough, they could get all the benefit of it, either by acquiring it or by being a customer of it. He was networking with his largest shareholder, Mr. Lowe, who was also the agent distributor for TDI, and he was networking with his protégé, Mr. Nishat, in order to keep this technology close to TDI to kind of pounce on it if it became valuable. So Bowie read the release language in the complaint in that case as releasing the director when he was, or the individual when he was working in his capacity as a director of the insured company. But there's nothing like that in this complaint. Is that your argument? There's nothing like that in the settlement, Your Honor, of TDI. TDI and, TDI settled with Nishat. Releasing all claims against TDI's claims were all dismissed, except a carve-out was made for claims against Mr. Goerner in any way, shape, or form. Any claim they wanted to make against Mr. Goerner, they could. Now, one thing I do want to point out is that California law is such that capacity does not have to be alleged, and that is why an officer would be stupid or ill-advised to buy policy that says, I'll only defend you if it's alleged that you're being sued in that capacity. Bowie itself said, oh, we're doing what we're doing because, let me make the analogy of a car accident. This is right in Bowie. It says, if a car accident was taken when you're not driving for your employer, then it's not covered by your employer's policy. That's true. But what if you were, in fact, driving for your employer, and the plaintiff doesn't sue, saying that? In other words, let's say you were working for Microsoft. You're driving a Microsoft truck, you run over somebody, and you're sued. It seems to me that the Microsoft policy would normally defend you, whether or not the plaintiff mentions your capacity. Now, the opposing counsel makes a lot of the fact that Mr. Goerner didn't ask TDI for indemnification. I guess the theory would be that if Mr. Goerner is sued, in fact, he was acting on behalf of TDI, then the TDI release would kick in because TDI would have an obligation to indemnify Mr. Goerner. I don't know if that's correct or not, but how do you respond to that argument that they make? Because the whole purpose of insurance is to make sure you don't have to sue your own corporation. Mr. Goerner did not want to sue his corporation for two reasons. Probably the best reason was, by that time, it was insolvent. It was a shell with not enough money to pay for his claim. That's a really good reason not to sue somebody. The other reason, it was still controlled by people that he had a relationship with in the venture capital field. Mr. Goerner was unemployed. He had been fired by TDI because his last act was to negotiate a sale to a British company that took over and was hostile to him. So he did not want to alienate the investors in TDI that had put him on the board in the first place, the investors in the venture capital field that had given him a job, and he thought they might be able to get him a job in the future. Now, recently, he just got reemployed, but it's tough when you're at the CEO level to find comparable jobs. And so it's in the record, it's in our brief discussing this, about why did he not sue. Number one, he doesn't have to. The whole purpose of B&O Insurance is to protect officers against hostile management of their own company and against their own company going under, not having enough money to pay. One last question. This wasn't, I think, addressed in your brief. In one of his declarations, I think it's a September 2006 declaration, Mr. Goerner says that his involvement with Lowe and Nishat was merely in an unofficial capacity as a friend, which seems to undercut the argument that his work in this MMT issue was on behalf of or in his capacity as a TDI officer. Now, how do you address that statement he made in his declaration? Okay, first, there is conflicting evidence, probably in the same declaration. First of all, I believe the declaration was written early on at a time when he was discussing the original complaint, because the original complaint talked about part of the relationship between Nishat and MMT and TDI that was just him getting involved. Later, the complaint, the First Amendment complaint, brought in a whole new conspiracy theory to steal trade secrets from some of TDI's customers. And that really implicated much more his activities developing technology for TDI. So, number one, it's discussing a time period that's different from what was eventually came at issue. And number two, it's just one piece of evidence that's conflicting. If there's conflicting evidence at all on this area, there's a duty to defend. And I know that there's 60 or 80 pages of Rick Gerner declarations talking about how what he did was, in fact, being done for TDI. Have I answered that question for you? Well, our standard for summary judgment is you can't create a genuine issue of material fact by having discrepant statements in your own declaration. So, I'm not sure how that affects the analysis. Could you re-read that quote one more time, Your Honor? It's from a, let's see. During the term of plaintiff's consultancy with MMT, I was contacted by both low and plaintiff several times to act as an intermediary between the parties due to communication difficulties and misunderstandings that arose between them. At all times, I was acting merely in an unofficial capacity as a friend to both low and plaintiff and did not represent any party and did not make any representations to any party. Okay. He's talking about to the extent he was a referee or a mediator or arbitrator in their disputes, he was acting in that capacity. He was also sued by Nishat for other things. For example, he was sued for sending an email to Nishat's boss saying, do not develop Nishat's technology. Instead, work through a company called Belton, which is much more established. Okay. That harmed Mr. Nishat because Mr. Nishat wanted his technology to be the next greatest thing in terms of wireless. He, Mr. Goerner, was sued for a lot of different things he did for TDI besides being a referee. That one sentence is limited to him being a referee. It does not discuss what he did in terms of firing Mr. Nishat, in terms of directing efforts of Nishat's technology to let them languish and not give enough resources. It did not discuss whether or not he had encouraged Mr. Nishat to stay on this, what turned out to be a dead-end job from which he was fired, by encouraging him that maybe TDI would acquire the technology and would acquire MMT. So I don't think that that one particular sentence, because it's so narrow, is enough to sink the whole ship. All right. You want to save a little time? Yes, I would, Your Honor. I think I have a minute and a half left. Thank you. All right. Good morning, Your Honors. And I'm also very honored to appear before this panel. I'd like to address something that just came up toward the end of my opponent's presentation, and that is this business about Mr. Gorner's declaration admitting that he was simply operating as an intermediary between two friends, as it showed up in Mr. Gorner's sworn declaration. I'd like to point out to Your Honors that there are several other places in the record and that were before the trial judge who took evidence after evidence, held hearing after hearing, to hear all the arguments that my opponent has chosen to make on the subject. The two additional bits of evidence that support and reinforce the declaration that Mr. Gorner swore to having to do as acting between friends. First of all, there is his deposition testimony. That is in the record at page 2227, in which he said he was acting as an intermediary between friends. And then there was a letter to his employer, and it's in the record at page 1228, essentially saying TDI had nothing to do with this. Now, one other ---- Your opponent says that this refers only to a small part of what the Second Amendment complaint is suing him for. And so even if that's true as a ---- for these particular actions, it doesn't apply to everything that's the subject of the complaint. Is that incorrect? I ---- it is incorrect because the read in context, which is how the trial court read the declaration of Mr. Gorner and how the evidence appears in the record, there is nothing limiting Mr. Gorner's statements to the effect that he was acting for a friend to any specific limited capacity. It's a general statement having to do with the entire litigation. And, in fact, when the first complaint, when the initial complaint was served, right away he notified his employer that this is something that TDI had nothing to do with. And, of course, the answer that you will hear from my opponent to that is, well, that was very, very early. But he had the whole first amended complaint that ---- I'm sorry, the whole initial complaint that had TDI strewn all through it before the TDI settled. And he still at that point said, this is not something of TDI's doing. This is nothing that had to do with the company. And one other point of clarification on a factual issue, in discussing the issue of whether he sought indemnification from his employer. In fact, Mr. Gorner did seek indemnification from his employer. The employer rejected indemnification, and that is in the record at page 2239. The rejection says, the reason, among other reasons, Mr. Gorner's request is being denied because the allegations of the NESHAT litigation do not arise or relate to, directly or indirectly, Mr. Gorner's former employment with TDI. Now, that was in contrast to something else my opponent mentioned. Oh, Mr. Gorner didn't want to fuss with TDI. It was a shell. It was ---- it had no money. In fact, the authors of this letter was a law firm, Wilson-Sonsini, in Northern California. And in fact, the rejection of indemnification is on behalf of TDI and the company that acquired TDI, Oxford. So there were ---- there was ample opportunity for Mr. Gorner to reject this rejection of his tender, to argue with ---- at least argue with the rejection of the notion that he had been acting as a TDI officer by the time this request for indemnification was made, which was after TDI was removed from the complaint. And this is something else that I'd like to ---- I'm sorry. I'd like to address. In looking at the litigation, it is very important to note that by the second amended complaint, there were no allegations. Judge Ikuda is 100% correct in stating that there were no allegations against Gorner as a CEO of TDI. They specifically allege that he is the ---- was acting for MMT and UNAS. But let me ask you this. Say that it turns out, in fact, that in the actions for which he's being sued, he was acting with his TDI hat on as a mentor, as trying to make connections, as networking, which is what is alleged by opposing party. There's nothing ---- I didn't see anything in the complaint that would prevent NESHAP from carrying forward with his suit, even if it turned out that Mr. Gorner had been taking some or all of those actions in his role as TDI director. So why isn't there a potential for coverage under those circumstances? That's all you need is a potential for coverage. That's correct. And this is the ---- this is a very interesting case on that very point, because the potential for coverage always reflects the notion that the plaintiff can amend their complaint. Right now, doesn't sue him as an officer director of TDI. But, hey, it could. This is the obverse. That's sort of a different issue, isn't it? Pardon me? That's sort of a different issue. The issue is whether he could say, the complaint could say, you are acting in your capacity. The point that opposing counsel makes, I think, forcefully, is that the insurance covers actions he takes in that capacity. The lawsuit doesn't have to say it's in that capacity. So the question is, if it turns out, in fact, some of the actions for which he sued, he did with his TDI hat on, why isn't there a potential for coverage? Particularly where they paid for his travel. Yes, and that's a good point. And that goes back to the policy language. Even my opponent concurs in the notion that we have to begin and really focus with or focus on and with the policy language, which requires, which says, access will pay for any suit alleging an act by, I'm sorry, the policy language says, the insurer shall pay in connection with a wrongful act per the insuring agreement below all loss on behalf of any insured arising from any D&O claim for a wrongful act. And then wrongful act means error, misstatement, misleading statement, act, omission, neglect, or breach of duty by an insured in his insured capacity. So it's not enough that he wear his TDI hat. The loss has to result from, has to arise from his conduct as an individual in his TDI capacity. And here the losses alleged have nothing to do with whether he took a trip, whether TDI paid for his trip to Singapore. In my case, I'll give you an example. In my case, I'm a lawyer. I have a law, in a law firm with errors and omissions, which is coverage, which is just very similar to directors and officers' coverage. I'm also a member of the Junior League. And sometimes I have in the press of business, my employer permits me to have people from the Junior League into my office, and we can discuss Junior League charity events that we're going to put on. And I can use my company car and attend a Junior League meeting. Those things are all interconnected with my office, but I'm not, if I'm sued for hitting or defaming somebody over the Junior League meeting, the loss did not result from my employment as a lawyer. Yeah, I'm a lawyer. I have E&O coverage at my law firm. But under this coverage, the loss has to result from the wrongful conduct in the capacity as a TDI officer. And here ‑‑ Excuse me, Counsel. How do we know that on summary judgment? Because TDI, as Judge Ikuda pointed out, TDI has absolutely settled the litigation as to its own liability. So TDI, in the most complete sense of the word, cannot have any liability for any actions taken by any officer, director, et cetera. Now, the ‑‑ Why did they leave him out in the cold? The same reason that the directors in Bowie were left out in the cold, because Neshat's attorney said, I don't want to, now that I've settled with TDI, I have no intention, I'm not suing Mr. Gurner in his capacity as a TDI officer. But they didn't release him for that. Well, I mean, on summary judgment, we're saying there are disputed issues of fact. And one of the disputed issues of fact is whether Mr. Gurner took any of the actions for which he's being sued in his capacity as the CEO of TDI. And I don't see anything in the complaint or in the settlement agreement that says the suit couldn't proceed forward against Mr. Gurner if it turned out some of those acts were taken in that capacity. So how do we get past the summary judgment standard under these circumstances? Because the policy language here, which is completely unambiguous, and I don't think there's any debate about that, says that the loss has to, the liability has to arise from the wrongful act in the capacity as a director. Using your hypothetical, if you go out in your company car to a meeting with a client and you hit someone and that person sues you and doesn't mention the fact that you're working for the law firm, that doesn't mean that your law firm coverage might not cover you. So here he's saying, well, some of these acts, even though the suit doesn't say that I was acting for TDI, in fact, I was. And so, therefore, I should get coverage under the plain language of the policy. I understand Your Honor's comment. And you look at the fact, what does the loss arise from? In the example that Your Honor used, I was driving in my company car and got in an accident and hurt somebody. You don't have to allege, it does not, the complaint doesn't have to allege the magic word capacity or that I'm a lawyer from my law firm. It has to allege that the loss arose from my conduct as a lawyer. So if it says on such-and-such a day I was driving to a deposition and hit somebody, that was in the ‑‑ that loss, the injury to the other person, arose as a result of my carrying out my company duties. In this case ‑‑ Do you mean you're not covered if the complaint doesn't have the word deposition in it? Is that what you're saying? I'm not saying that. I'm saying there's no magic words. You have to look, under all of the relevant case law, at the facts as they're alleged in the complaint. And you have to see if there are extrinsic facts that apply to this. And the extrinsic facts that apply to this, first of all, the complaint doesn't say that he is, in fact, acting for TBI. In fact, it says the opposite, that, in fact, he was operating for MMT and for UNAV. So what are the other facts? You go out and look. And the other facts are, the drafter of the complaint says, I didn't intend to sue him having anything to do with TBI. And didn't sue him, no loss is alleged as a result of his conduct for TBI. Yes, he remained a director for TBI for some time. His status, just as in Bowie, was he was a director for TBI. But the loss here was expressly the elements of the complaint, the first amended and the original complaint, that asserted these acts were taken as an officer of TBI, were removed from the complaint. Twenty-five allegations regarding his acts for TBI were removed. That's another extrinsic fact. I'm looking for something in the complaint that says, and if it turns out that some of these acts were actually taken in his capacity as a CEO for TBI, then we don't sue him for those. And what's the closest to that? Because that's what I don't see in the complaint. What's missing here is not, we're skipping over the fact that the policy requires that the loss arise from his acts, wrongful acts in the capacity as a CEO. The loss arise. And there is not a hint in here, and every bit of extrinsic evidence except the protestations of Mr. Garner himself, all of the extrinsic evidence is that he did not, he was not, the loss did not arise from his activities for TBI. In fact, the six mentions left in the complaint regarding TBI had to do with the place where certain communications took place. No loss arose because of the place the communications took place, that Garner traveled to Singapore to discuss MMT with Lowe. My company pays for me to travel around in a company car and permits me to talk about Junior League business. There's no loss arising from that travel to Singapore per se. That Garner introduced people, plaintiffs to people at TBI, and told them he was specifically holding a meeting regarding TBI, that's in paragraph 47 of the complaint. No loss arises because of the, or is alleged to have arisen from that. But why would they pay for him to go there? They were paying for him because he had a host of projects in Singapore. He traveled. If you'll look in the record, you'll see that Mr. Garner had extensive travels to the Far East. Oh, indeed. But why did another company pay for him then? Because he was permitted on the terms of his employment to network, to have the business by networking. Is that correct? I don't know that he was helping his business. I suppose we all help our businesses indirectly when we network. But the problem is he wasn't sued for networking. No loss arose because of networking. Mr. Garner stated in his own declaration and in multiple places in the, in other documents that he was simply helping a couple of friends. This had nothing to do, as he said to his own company, I wasn't doing this for TBI, doing this to help a couple of friends. Thank you, Your Honors. Okay. Thank you. I appreciate your patience. Yeah. A lot of passion here today. And you better control yourself, too. You know, you're not, you know, I don't want to jump on you. But you don't want to start using examples with a judge on the bench. If this happened to you, you know, that's not smart. And it's also not too smart to get up and quote some of our cases. That's what I think, you know. Let me not do that. It's like you're pandering. Then I saw you jump up over that. It's not a trial. That's what I was going to apologize for, Your Honor. Yeah. But you're an experienced lawyer. You should know better. We're giving you priority today. Thank you. Yeah. And I apologize for jumping up because I was jumping up because I thought for a second I was in trial, like I'm supposed to go to trial after this. And she misread the language of the policy by leaving out the key words actual or alleged. The definition of wrongful act starts out with the words actual or alleged. And that's what's important here because what happened was Mr. Garner's acts were actually in his capacity as a TDI officer. And the language in Bowie, like the classic case of Gray and the classic case of Montrose Chemical, says that you don't let the third party, the underlying plaintiff be the arbiter of coverage of the insurance company. And Bowie himself says we do not let the third party be the arbiter because he may be deciding to try to isolate the defendant and let him hanging without the ability of insurance behind him. And the New York equivalent of Gray v. Zurich is that Fitzpatrick case over at page 55 of our opening brief, which says that the draft, the underlying draft of the pleading, may be unaware of the true underlying facts or nuances that may affect the defendant's coverage and may, might not be in the insurer's or the insurer's interest to reveal them. So it may not be in the underlying plaintiff's interest to reveal how much TDI was involved, especially after it had agreed to take out mentions of TDI in the first amended complaint, in the second amended complaint. But the ironic thing is they disobeyed the settlement agreement. The settlement agreement says we're only going to keep TDI in for the location. But then in eight different places cataloged, fortunately, by the active brief at pages 38, 39, and 40, in eight different ways the second amended complaint still talks about how Goerner's activities as a TDI officer are relevant to his complaint. And these are not just background facts. They rely upon a declaration by the drafter of that complaint that was never available to them when they denied coverage. And you're not allowed to do and look in retrospect or in hindsight to justify your denial of the tender. You evaluate the tender at the time it's made. And what was in existence was the second amended complaint and the extensive evidence that Mr. Goerner had given to the insurance company. Thank you very much for your attention and for the priority. Thank you very much. And for the lessons I hope you've learned. All right. We'll call the next matter. Singh v. Holder. Thank you.
judges: Pregerson, Nelson D. W., Ikuta